# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MARK DZIAMALEK,
      Plaintiff,

v.

ANDREW SAUL, Commissioner of Social
Security,
      Defendant.

No. 3:18-cv-287 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In this Social Security appeal, Mark Dziamalek moves to reverse the decision by the

Social Security Administration ("SSA") denying his claim for disability insurance benefits or, in

the alternative, to remand the case for an additional hearing.  Mot. to Reverse, Doc. No. 23.  The

Commissioner of the Social Security Administration[1] ("Commissioner") moves to affirm the

decision.  Mot. to Affirm, Doc. No. 24.  For the reasons set forth below, Dziamalek's Motion to

Reverse (doc. no. 23) is DENIED and the Commissioners Motion to Affirm (doc. no. 24) is

GRANTED.

## I.      Standard of Review

The SSA follows a five-step process to evaluate disability claims.  *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam).  First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity."  *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)).  Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

---

[1] The case was originally captioned "Mark Dziamalek v. Nancy A. Berryhill, Acting Commissioner of Social Security."  Since the filing of the case, Andrew Saul has been appointed the Commissioner of Social Security.

an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.* (citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does not have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can

do; he [or she] need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374-75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447-48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.    Facts

Dziamalek filed for Social Security benefits on October 21, 2013. App. for Benefits, Ex. 1D, R. at 260. In his application, Dziamalek alleged a period of disability beginning April 1, 2010. *Id.* at 261. Dziamalek alleged in his application that he suffered from mental illness; curved spine; arthritis in arms, hands, and legs; lumps in lungs; and right bundle blockage of heart. Int'l Disability Determination Explanation, Ex. 2A, R. at 126. As discussed more fully below, Dziamalek's application was denied at each level of review, and he seeks an order reversing the Commissioner's decision.

A. Medical History

The relevant time period for Dziamalek's medical history is April 1, 2010, the alleged disability onset date, to December 31, 2015, the date last insured. Just before the alleged onset date, on March 15, 2010, Dziamalek was seen at the cardiology department at HeartCare Associates, LLC, and treatment notes reflect that he had no swelling or pain in extremities, but had shortness of breath. Ex. 2F, R. at 451. Treatment notes from the same provider similarly reflected no swelling or pain in extremities on September 20, 2010, but no shortness of breath. Ex. 2F, R. at 448. Dziamalek was hospitalized at Yale New Haven on February 16, 2011 for a Tylenol overdose, in which he took roughly 180 pills. Ex. 13F, R. at 763. He was released on February 18, 2011. *Id*. On March 14, 2011, treatment notes from HeartCare Associates, LLC again reflected that he had no swelling or pain in his extremities and no shortness of breath. Ex. 2F, R. at 449.

On August 8, 2011, Dziamalek underwent an exercise stress test, which was terminated after eleven minutes and one second for shortness of breath. Ex. 2F, R. at 453. Treatment notes reflect that Dziamalek had no arrythmias and had "[v]ery good exercise capacity." *Id*. On August 26, 2011, Dziamalek underwent a pulmonary function test with Dr. Michael Imevbore at Connecticut Pulmonary Specialists, PC, which showed that his Forced Vital Capacity ("FVC") was "mildly reduced", but that his total lung capacity was normal. Ex. 3F, R. at 485. On the same day, Dr. Imevbore noted that Dziamalek was a "pleasant gentleman with multiple lung nodules and active nicotine addiction" as well as Chronic Obstructive Pulmonary Disorder ("COPD"). Ex. 3F, R. at 491-92. Dziamalek reported "progressive shortness of breath" and a physical examination revealed "reduced air entry bilaterally." *Id*. On September 12, 2011, Dziamalek underwent a CT Scan of his chest for a follow up on "lung nodules," which revealed "tiny" nodules that were "most likely benign." Ex. 13F, R. at 760. HeartCare Associates

treatment notes from July 23, 2012 again reflected no swelling or pain in Dziamalek's extremities nor shortness of breath. Ex. 2F, R. at 447.

On November 5, 2012, Dziamalek returned to BH Care, Inc. "for an evaluation in order to 'please' the courts" because he was on probation for two charges of breach of peace stemming from an argument with his fiancé's son. Ex. 4F, R. at 493. Treatment notes reflect that Dziamalek had been unemployed since 2010, and had drug possession charges from 2009 and one from 10-15 years prior. *Id.* On January 28, 2013, Dziamalek returned to Heartcare Associates for a transthoracic echocardiogram. Ex. 2F, R. at 473. The report from that procedure and treatment notes revealed an abnormal electrocardiogram, right bundle branch block, essential hypertension, and hyperlipidemia. *Id.*; *see also* Ex. 2F, R. at 436. On March 14, 2013, Dziamalek went to Yale New Haven Hospital for shortness of breath and a cough. Ex. 1F, R. at 423. Treatment records reflect that Dziamalek had no swelling in his lower extremities, but had "blood-tinged sputum" most likely due to bronchitis. Ex. 1F, R. at 424. Outpatient treatment care was continued and Dziamalek was prescribed pain medication as needed. *Id.* Progress notes from Dr. D'Aria from April 9, April 30, and May 23, 2013 reflect that Dziamalek had normal gait and no leg swelling. Ex. 1F, R. at 329, 331, 333. HeartCare Associates treatment notes from April 18 and May 20, 2013 further reflect no swelling in Dziamalek's lower extremities. Ex. 2F, R. at 438, 441.

Dziamalek was sent by the police to the hospital via ambulance on June 12, 2013 because he was found with alcohol and cocaine, and was "aggressive, agitated, and want[ed] to fight." Ex. 1F, R. at 420. He was given a toxicology screening, which was positive for both alcohol and cocaine, and discharged. *Id.* Progress notes from Dr. D'Aria from September 6, 2013 reflect that Dziamalek complained of shoulder pain, and was given pain medication, but had normal gait

and no leg swelling. Ex. 1F, R. at 327-28. Dziamalek was seen by Dr. D'Aria again on

September 16, 2013 and treatment notes make no mention of shoulder pain. *Id*. at 325. On

September 20, 2013, Dziamalek underwent an x-ray on his left foot which showed "[m]oderate

degenerative changes" when compared to 2010. Ex. 13F, R. at 785. Shortly thereafter, on

September 30, 2013, Dziamalek presented to HeartCare Associates with palpitations. Ex. 1F, R.

at 417. Treatment notes from that visit reflect that Dziamalek had completed alcohol

rehabilitation and was sober. *Id*. Further, notes reflect that he had no lower extremity swelling.

Ex. 1F, R. at 418; *see also* Ex. 2F, R. at 440. Providers discussed Dziamalek's nutrition and

healthier daily habits, provided him with medication, and discharged him. Ex. 1F, R. at 418-19.

On October 4, 2013, Dziamalek underwent a chest CT scan which revealed "new

scattered subtle [lung] nodules" and COPD. Ex. 3F, R. at 481. On October 7, 2013, treatment

notes from BH Care, revealed "unremarkable" thought process and content, orientation, and

energy. Ex. 4F, R. at 504. Further, notes reflect that Dziamalek was "irritable" but

"cooperative" and "attentive", and had minimally impaired judgment and insight and was

making progress in his sobriety. *Id*. On October 11, 2013, Dziamalek was described by Dr.

Imevbore as a "pleasant active smoker with COPD and lung nodules." Ex. 1F, R. at 396. A

pulmonary function test revealed worsening airflow limitation. *Id*.

On October 20, 2013, Dziamalek was again sent to the hospital by the police via

ambulance because he was using drugs (heroin and cocaine) and drinking at home and his family

feared that he was suicidal. Ex. 1F, R. at 414. Treatment records reveal that Dziamalek had no

leg swelling, no edema, no swelling or deformity in his right shoulder, and normal range of

motion. Ex. 10F, R. at 549. He did complain of right elbow pain because he was struck with a

crowbar in an altercation. *Id*.; *see also* Ex. 1F, R. at 411. Dziamalek was evaluated as anxious

and agitated, with impulsivity and inappropriate judgment, but without homicidal or suicidal ideations.  Ex. 10F, R. at 549.  He was released that day but returned to the emergency room on October 31, 2013 after a suicide attempt via drug overdose.  Ex. 1F, R. at 406.  He was released and was seen again on November 3, 2013 for right lower arm pain, but tests revealed no acute fracture.  Ex. 1F, R. at 400.

Dziamalek was hospitalized on November 6, 2013 for substance abuse, altered mental state (likely due to alcohol withdrawal), unsteadiness, COPD, abnormal chest CT scan, and left wrist pain.  Ex. 10F, R. at 648.  Treatment notes from that time frame reflect that Dziamalek also had shoulder pain, left wrist pain, and finger numbness resulting from the restraints needed for evaluation because he was "aggressive and combative."  *Id*. at 649.  A hand and wrist x-ray were normal and showed "no acute fracture or dislocation", and notes reflect that "a full neurological exam was inconsistent" because Dziamalek was seen "walking briskly and performing fine motor tasks with excellent coordination" but, during testing, "his grip strength [was] weak and coordination [was] off balance."  *Id*.  Further, Dziamalek had "good balance and coordination with standing" but walked to the door with "slow gait and into hallway".  *Id*. at 650.  Treatment notes also reflect that he had "poor short term memory."  *Id*. On November 11, he underwent an x-ray on his left shoulder which showed "no acute fracture or dislocation" and joints that were "well-maintained" and "intact."  Ex. 13F, R. at 786.  He was released from the hospital on November 13, 2013.  Ex. 10F, R. at 648.  He returned to the emergency room on November 15 and was "confused" with slurred speech and complaining of left ear pain.  Ex. 10F, R. at 613, 617.  His family reported they thought Dziamalek took too much Valium.  *Id*. at 617.  After a few hours, Dziamalek was "completely conversant, interactive, and alert and oriented with steady gait and speech."  *Id*. at 615.

Dziamalek was hospitalized at Yale New Haven Psychiatric Hospital on November 20, 2013 after he cut his left wrist in a suicide attempt. Ex. 1F, R. at 342. He sustained lacerations to his ulnar nerve and artery and his flexor carpi ulnaris and palmaris longus tendons. Ex. 10F, R. at 668. He underwent surgery to repair the lacerations and "tolerated the procedure well" and had no complications. *Id*. He was given pain medication and discharged back to the psychiatric hospital on November 25, 2013. Ex. 1F, R. at 360. Treatment notes reflect that Dziamalek reported that his change in medication caused his suicidal ideations. *Id*. at 361. He was given a hand splint and notes reflect that, upon discharge from the hospital, his wrist and fingers flexed and extended, but he had no sensation over his small finger, and diminished feeling over his ring finger. *Id*. at 362. He was discharged on November 28, 2013. *Id*. at 360.

On December 4, 2013, Dziamalek was seen at Yale New Haven Hospital for a post-operation evaluation where notes reflect that he was "doing well" and was "able to make a fist easily", but had "no sensation in [his] small finger" and "decreased sensation" in his fourth finger. Ex. 6F, R. at 517, 519. Treatment notes report that the wound was "healing well" and Dziamalek was given an "anticlaw splint" to wear at night, a wrist brace to protect the wound, and referred to occupational therapy. *Id*. at 519. He returned to BH Care on December 4, 2013 and reported "feeling significantly better" after his hospitalization. Ex. 11F, R. at 722.

On December 16, 2013, Dziamalek began occupational therapy for his hand. Ex. 10F, R. at 678. Progress notes reflect that he disliked the night splint and was wearing the hand splint full time and had "no edema in [his] digits." *Id*. at 679. He put in "fair" effort, could manipulate common objects, "[w]orked well on focused tasks for [one hour]", and was "[c]omplying well w[ith] appropriate precautions." *Id*. He returned to occupational therapy on December 23, 2013, and progress notes reflect that Dziamalek put in "good" effort and "performed self massage well

after instruction and encouragement" but that "raised thick fibrotic area may impede ulnar nerve regeneration." Ex. 10F, R. at 681. He returned on December 30, 2013 and notes reflect "good" effort and active range of motion, and a "hard, raised scar tissue at site of repair" but that "scar massage very effective today." Ex. 10F, R. at 683. His left-hand grip strength was 45 pounds, and pinch strength was 8 pounds. *Id*. at 684. Progress notes from January 6, 2014 reflected that Dziamalek complained that his pinky hurt, that he "lack[ed] fine motor control" and "digital extension deficit" was persistent. Ex. 10F, R. at 686. Further, notes reflected that there were "signs of atrophy from denervated muscles" and Dziamalek was instructed to "stop covering the area to allow it to desensitize" and to use the scar pad at night rather than the day. *Id*. Further, notes reflect that Dziamalek "tend[ed] to minimize left hand deficits" but that "gains [were] noted in all areas." *Id*.

Progress notes from January 21, 2014 reflect that Dziamalek was moving his hand more comfortably and covering it less. Ex. 10F, R. at 690. Notes reflect that Dziamalek "complie[d] well with HEP and [was] trying to use his hand more often." *Id*. at 691. Progress notes from January 27, 2014 reflect that Dziamalek had "mild ulnar clawing" and that he "tend[ed] to over stretch and flex/extend with all his might" but showed "sig[nificant] improvement." Ex. 10F, R. at 694. Progress notes from February 6, 2014 reflect Dziamalek put in "excellent effort" but complained that he could not use his left hand because the "small finger [was] always in the way" and it was "tingly all the time." Ex. 10F, R. at 696. His left-hand grip and pinch strength showed "sig[nificant] gain" since his last visit. *Id*. at 697. Progress notes from February 10, 2014 showed that he lacked digital abduction/adduction and Dziamalek was encouraged to follow up with the surgeon about his progress. Ex. 10F, R. at 698-99. Progress notes from February 17, 2014 reflected that Dziamalek's hand was "much improved" but that he had a

"classic claw deformity" and was "unable to extend ulnar digits" but showed "sig[nificant] gains in all areas." Ex. 10F, R. at 701-02. On February 24, 2014, Dziamalek complained that he continued to have "inabilities in [his] left hand" and could not peel potatoes or open cans, and had "great difficulty" cutting a tomato. Ex. 10F, R. at 705. Notes reflect a "decreased palmar arch" and "claw hand deformity." Ex. 10F, R. at 706.

Throughout the time while Dziamalek was doing occupational therapy for his hand, he was also continuing with group therapy for his substance abuse at BH Care. *See* Ex. 8F, R. at 521-36. Progress notes from all sessions[2] reflect that Dziamalek's affect, mood, thought process, orientation, and behavior were unremarkable. *See id*. Dziamalek expressed that he was serious about his recovery and also wanted to learn to "manag[e] his anger and emotions in a way that support[ed] his recovery and maintain[ed] healthy relationships." Ex. 8F, R. at 527. Further, as of February 24, 2014, Dr. Riordan determined that Dziamalek had a Global Assessment of Functioning ("GAF") score of 45 which reflected either moderate symptoms or "moderate difficulty in social, occupational, or school functioning. Ex. 11F, R. at 721. That had improved from Dr. Riordan's assessment from December 4, 2013 in which he found that Dziamalek had serious impairment in social, occupational, or school functioning. Ex. 11F, R. at 718.

On May 6, 2014, Dziamalek was seen by Dr. Imevbore for a follow up chest CT scan that was compared to two prior scans from September 2011 and October 2013. Ex. 17F, R. at 849. Notes from the visit reflect that the "few small bilateral lung nodules" were "stable," "unchanged," and "consistent with benign findings." *Id*. There was, however, a "changed pattern of patchy groundglass parenchymal disease in upper lobes," likely caused by inflammation, infection, or idiopathy. *Id*. Dr. Imevbore recommended "continued interval CT

---

[2] The dates of those sessions were: January 7, 8, 9, 14, 15, 16, 22, 23, 28, 29, 30, February 4 and 11, 2014. *See* Ex. 8F, R. at 521-36.

follow-up." *Id.* Dziamalek underwent another CT scan on September 17, 2014 which was compared to the May 2014 scan which again showed the nodule was "unchanged" and "consistent with a benign finding." Ex. 19F, R. at 1066. Further, on November 17, 2015, Dziamalek underwent another CT scan which reflected that, when compared to March 2013 and May 2014, the right nodule was unchanged. Ex. 17F, R. at 843.

Dziamalek was incarcerated from August 20, 2014[3] to January 16, 2015 for violation of probation. *See* Ex. 16F, R. at 809. Dziamalek returned to BH Care on January 29, 2015 for treatment following his incarceration, and intake notes reflect that he had minimally impaired judgment and insight. Ex. 16F, R. at 801, 804. Treatment notes reflect that Dziamalek continued to have unremarkable judgment, thought process and content, orientation, and behavior. *See* Ex. 16F, R. at 814-28.

On June 25, 2015, Dziamalek presented at Back to Health Branford LLC with arm and shoulder pain that had been occurring for three weeks. Ex. 224, R. at 1509. Dziamalek reported that he had numbness, tingling, and pain in his arms as well as pain and a "grinding sensation" in his shoulders. *Id.* Treatment notes reflect that Dziamalek had an "extremely limited" range of motion in his shoulders, "shuddered" with pain with light palpation of both shoulders, and refused to attempt shoulder rotation due to pain. *Id.* Dziamalek was sent for an MRI, but refused physical therapy because he could not move his shoulders and also refused anti-inflammatory medication. *Id.* He returned to Back to Health on July 20, 2015 to review the MRI and reported that he still had numbness in his arms. Ex. 22F, R. at 1506. Treatment notes reflect that Dziamalek reported continuing "exquisite pain" in his shoulders "with even the

<hr>

[3] BH Care notes reflect that Dziamalek was incarcerated "8/20/15-1/16/15" which is clearly a typographical error. *See* Ex. 16F, R. at 809. Records from the Department of Correction reflect that Dziamalek was incarcerated in August 2014 through January 2015. *See* Ex. 20F.

slightest palpation" as well as "numbness and tingling down both arms when elevated over his head." *Id*. The MRI reflected that Dziamalek had right shoulder tendinopathy and had small bony fragment anterior to acromion in his left shoulder. *Id*. at 1507. Dziamalek was referred to an orthopedist but was "extremely resistant to the idea of any form of surgery" and continued to refuse physical therapy because "he [could] not 'move his arms.'" *Id*. Treatment notes reflect that Dziamalek was told he was "out of options" because he refused everything else. *Id*.

Dziamalek continued to treat with Back to Health Branford through 2016 and 2017, with Dr. Michael Wong, beyond his disability coverage date. *See* Ex. 22F. Treatment notes reflect that Dziamalek complained regularly of hip and back pain, back spasms, and difficulty breathing. *See* R. at 21-22, 47-77.

B. Procedural History

Dziamalek filed for Social Security benefits on October 21, 2013. App. for Benefits, Ex. 1D, R. at 260. The SSA initially denied Dziamalek's disability benefits claim on March 11, 2014. Denial of App., Ex. 1A, R. at 125. The SSA found that Dziamalek's condition resulted in "some limitations in [his] ability to perform work related activities" but that his condition was "not severe enough to keep [him] from working." DIB Int'l Explanation, Ex. 2A, R. at 139. Further, although it did "not have sufficient vocational information to determine whether [he could] perform any of [his] past relevant work", the SSA determined that Dziamalek could "adjust to other work." *Id*. Dziamalek's claim was again denied upon reconsideration on October 27, 2014. Reconsideration Transmittal, Ex. 3A, R. at 140. In doing so, the SSA stated that Dziamalek was "responsible for furnishing evidence to support [his] claim, and, despite SSA's requests for him to do so, Dziamalek failed to provide anything additional. DIB

Reconsid. Explanation, Ex. 4A, R. at 154. The SSA concluded that "a determination [had] been made based on the evidence in file", which "[did] not show that [Dziamalek was] disabled." *Id.*

On December 12, 2014, Dziamalek requested a hearing before an Administrative Law Judge ("ALJ"). Hr'g Request, Ex. 4B, Doc. No. 166. The hearing was held on July 11, 2016 before ALJ Matthew Kuperstein. Tr. of ALJ Hr'g, R. at 79. The hearing record consisted, in part, of medical records from various treatment providers from December 2010 to May 2014. *See id.* at 86; *see also* Ex. 1F-15F, R. at 325-800. At the hearing, Dziamalek's attorney submitted hospital records from Yale New Haven Health from July 2015 through March 2016, which were marked at 19F.[4] Tr. of ALJ Hr'g, R. at 82. Even though it was a late submission, the ALJ accepted them into the record. *Id.*, R. at 82-84. The ALJ then left the record open for three weeks for any additional medical records to be submitted. *Id.* at 85. Dr. Chukwuemeka Efobi was present for the hearing, but the ALJ released him without testimony because the supplemental medical records related to Dziamalek's physical health, rather than mental health. *Id.* at 87. The ALJ stated that if any further records came in that stated anything different from earlier mental health treatment notes, then he would hold a supplemental hearing. *Id.*

Dziamalek testified that he stopped working at his last job around April 1, 2010, and had not worked since, which is why he picked that date as his alleged onset date. Tr. of ALJ Hr'g, R. at 93, 98. He testified that he could not remember if he was fired or if he quit, but he could no longer perform the work because his depression and anxiety were "just so bad" that he "couldn't function anymore." *Id.* at 93. From 2006 to 2010, he worked at Dunkin' Donuts as a doughnut preparer, which included frosting the donuts and preparing them for sale. *Id.* at 98. Dziamalek testified that while he worked there he stood all day and could lift up to 20 pounds at a time. *Id.*

---

[4] During the hearing, the ALJ stated that the Yale records would be Exhibit 16F (*see* Tr. of ALJ Hr'g, R. at 86) but the List of Exhibits reflects that those records were marked as Exhibit 19F. *See* List of Exhibits, R. at 46.

at 98-99.  Before Dunkin' Donuts, he worked in shipping and receiving at BJ's Wholesale Club from 2001 to 2004.  *Id*. at 99.  There, he mostly stood but sometimes sat for 20 minutes at a time and could lift up to 50 pounds at a time.  *Id*. at 99-100.

Dziamalek testified that he had not been able to work since 2010 for a number of reasons related to his physical and mental health.  Tr. of ALJ Hr'g, R. at 100-02.  With respect to his mental health, Dziamalek testified that he had anxiety every day, was depressed, and "[could not] concentrate anymore on one certain thing" because his "mind [kept] running," which was not helped by medication.  *Id*. at 100.  With respect to his physical health, Dziamalek testified that he had problems with his back, right leg, and left hand.  *Id*. at 100-02.  He testified that his back and leg were "shot" and his left hand was "useless."  *Id*. at 100.  It appears from his testimony that his right leg problems began when he was in the hospital in March and April of 2015, after which he was diagnosed with a hematoma.  *Id*. at 101-02.  He testified that his leg would swell but he had been denied medication so he "[could not] get any help for the pain."  *Id*. at 100.

He testified that his health issues affected his ability to help his father and brother around the house, and he could only do "very little" such as "a few dishes in the sink … and maybe pick up the newspaper", but he could not do any landscaping or snow removal.  Tr. of ALJ Hr'g, R. at 94.  Further, he testified that his physical health issues affected his ability to drive, which he did "not too often," and he could only do so for 15-20 minutes at a time.  *Id*. at 96.  Further, sometimes his "throwing up [was too] bad" and someone else drove him to his appointments or meetings.  *Id*. at 107.  Dziamalek testified that he could only stand or walk for 15 minutes at a time because of his back issues and because his right leg would swell up, and he could only sit for 20 minutes at a time.  *Id*. at 95-96.  Further, Dziamalek testified that when his leg would

swell, he would "lay in bed with [his] leg up [and] watch TV", which was "basically what [he did] every day." *Id*. at 100, 107. Dziamalek also testified that in 2010 he drank and used drugs (specifically crack cocaine, heroin, and pills), but stopped drinking in 2014 and stopped doing drugs in 2011. *Id*. at 105. He testified that he smoked a half a pack of cigarettes per day. *Id*.

The ALJ next heard testimony from Vocational Expert ("VE"), Ruth Baruch, who testified that Dziamalek's prior work as a "doughnut baker" was considered a "semi-skilled" position with "medium" exertional level, that Dziamalek "performed in a light capacity." Tr. of ALJ Hr'g, R. at 109-10. Further, she testified that his prior work as a "floor worker" at B.J.'s was considered a "semi-skilled" position with "heavy" exertional level, that Dziamalek "performed in medium capacity." *Id*. The ALJ asked Baruch to consider a hypothetical individual with the following characteristics: the above-mentioned past jobs; high school level education; age 51; limited to medium exertional work with a need to avoid concentrated exposure to fumes, odors, dusts, gases, or poor ventilation; and limited to work that involved routine work tasks with no interaction with the general public, and involved only occasional collaboration or teamwork with others. *Id*. at 110-11. The ALJ asked Baruch whether that hypothetical individual could perform any of Dziamalek's prior jobs, and Baruch testified that she would rule out Dziamalek's past work because his work at BJ's was not "totally routine" given his work with machines, and his work at Dunkin' Donuts would require him to be around odors and fumes. *Id*. at 111. Baruch testified further that the hypothetical individual would be able to work in the following medium exertional, unskilled jobs: (1) dishwasher, with 277,840 jobs nationwide and 3,342 in Connecticut; (2) warehouse worker, with 20,222 jobs nationwide and 200 in Connecticut; and (3) hand packager, with 41,600 jobs nationwide and 415 in Connecticut. *Id*. at 111-12.

15

For the second hypothetical, the ALJ asked Baruch to assume the same individual but with the additional limitations of light exertional work with "only occasional climbing, balancing, stooping, kneeling, crouching, or crawling." *Id*. at 112. Baruch testified that the hypothetical individual would be able to work in the following light exertional, unskilled jobs: (1) price marker, with 214,689 jobs nationwide and 2,356 in Connecticut; (2) mail sorter, with 16,425 jobs nationwide and 454 in Connecticut; and (3) electrical assembler, with 5,244 jobs nationwide and 251 in Connecticut. *Id*.

The ALJ limited the hypothetical even further to include sedentary exertional work with the other non-exertional limitations described. *Id*. Baruch testified that the hypothetical individual would be able to work in the following sedentary, unskilled jobs: (1) table work, with 5,123 jobs nationwide and 83 in Connecticut; (2) surveillance-systems monitor, with 8,830 jobs nationwide and 81 in Connecticut; (3) a touch-up inspector, with 1,600 jobs nationwide and 60 in Connecticut; (4) laminator, with 1,400 jobs nationwide and 60 in Connecticut; and (5) eyeglass polisher, with 1,710 jobs nationwide and 43 in Connecticut. *Id*. at 113-14. Baruch testified that each of those occupations would be available to the hypothetical individual even when "further limited to work that could be learned in 30 days and involve[d] repetitive tasks in addition to routine tasks[.]" *Id*. at 114.

Further, Baruch testified that all the eleven jobs previously mentioned would still be available to the hypothetical individual with the further limitation of *only frequent* "handling, fingering, or feeling with the … left, non-dominant upper extremity." *Id*. at 114-15. The ALJ then changed that limitation to *only occasional* "handling, fingering, or feeling with the left, non-dominant upper extremity", and Baruch testified that the only job still available would be the surveillance systems monitor, because the other jobs "require frequent bilateral hand usage." *Id*.

16

at 115.  Further, Baruch testified that there were no additional jobs available because "[t]he majority of these routine, unskilled jobs – type work [required] frequent bilateral hand use."  *Id*.

The ALJ then limited the hypothetical even further to include the need to be "off task for 11 percent of an eight-hour work day, in addition to regularly scheduled work breaks on a regular basis."  *Id*.  Baruch testified that was "significant" and would affect the individual's ability to perform any of the listed positions because "anything over 10 percent is not going to be tolerated, and he would not be able to maintain employment if that were the case."  *Id*. at 115-16. With the additional limitation of the individual needing to elevate his right leg "as needed during the course of a work day … to his waist level", Baruch testified that the 11 listed jobs would not be available, and there would not be any work at the medium, light, or sedentary exertional levels with that additional limitation.  *Id*. at 116.  With the added limitation of needing a cane to ambulate, Baruch testified that she would "rule out" medium and light exertional work.  *Id*. at 116-17.

The ALJ then added into the hypothetical the need "to be able to change position as needed during the course of a work day but could only sit for … up to 20 minutes at a time … or stand or walk for 15 minutes at a time" so the individual would be alternating sitting and standing as needed, without the cane limitation.  *Id*. at 117-18.  Baruch testified that she would "rule out" medium work but that the individual would be able to do the light exertional jobs, except the mail sorter, though with the following limitations: the price marker work would be reduced by fifty percent and the electrical assembler would be reduced by thirty percent.  *Id*. at 118.  With the added limitation of needing a cane to *ambulate*, Baruch testified that the remaining jobs would still be available, but if a cane was needed to *stand*, the jobs would not be available because the individual would no longer be able to work bilaterally.  *Id*. at 119.  Baruch

testified that her testimony was "consistent with the Dictionary of Occupational Titles" ("DOT") with the exception of the sit-stand issue, because the DOT did not provide for that, but the estimation was based on her "over twenty years … [of] expertise as a vocation rehab counselor." *Id*. at 119-20.

After the hearing, Dziamalek submitted the following additional medical records: treatment records from BH Care, Inc. from April 2014 to February 2016 (Ex. 16F); progress notes from Connecticut Pulmonary Specialists from March 2015 to January 2016 (Ex. 17F); office treatment records from Gastroenterology Center of Connecticut from February 2016 to May 2016 (Ex. 18F); and progress notes from Connecticut Department of Corrections – UCONN Health Center from March 20014 to November 2014 (Ex. 20F). *See* List of Exhibits, R. at 46.

On February 2, 2017, the ALJ issued an opinion in which he found that Dziamalek "was not under a disability within the meaning of the Social Security Act from April 1, 2010, through the date last insured[, December 31, 2015.]" ALJ Decision, R. at 29. At the first step, the ALJ found that Dziamalek was "not engage[d] in substantial gainful activity during the period from his alleged onset date of April 1, 2010 through his date last insured of December 31, 2015." *Id*. at 30. At the second step, the ALJ determined that through December 31, 2015, Dziamalek had the following severe impairments: "bilateral shoulder osteoarthritis, depressive disorder, tendinopathy of the right shoulder, degenerative disc disease of the cervical spine, residual effects of left wrist tendon and nerve repair, chronic obstructive pulmonary disorder ['COPD'], anxiety disorder, and history of coronary artery disease." *Id*. at 31. The ALJ found that those "medically determinable impairment[s] significantly limit[ed Dziamalek's] ability to perform basic work activities." *Id*. Further, the ALJ found "objective evidence in the medical record of nonsevere impairments that ha[d] caused only a slight abnormality or a combination of slight

abnormalities that would have no more than minimally effected [Dziamalek's] ability to meet the basic demands of work activity", including "degenerative disc disease of the lumbar spine, history of substance dependence disorder in remission, hypertension, arthritis in legs, and right leg compartment syndrome versus vascular injury." *Id*.

At the third step, the ALJ determined that Dziamalek "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments[.]" *Id*. at 32. The ALJ stated that he considered a number of listings in the SSA regulations and determined that the medical record did not support a finding that any of Dziamalek's mental and/or physical impairments equaled any of the listings. *Id*. at 32-34. The ALJ then assessed Dziamalek's Residual Functional Capacity ("RFC") and found that he could perform light work with the following limitations: (1) must avoid concentrated exposure to fumes, odors, dust, gases, or poor ventilation; (2) no interaction with the general public and only occasional collaboration or teamwork with others; (3) only occasional climbing, balancing, stooping, kneeling, crouching, or crawling; (4) work that could be learned in 30 days and involved routine and repetitive tasks; and (5) only frequent handling, fingering, or feeling with the non-dominant left upper extremity. *Id*. at 34.

At the fourth step, the ALJ determined that Dziamalek was "unable to perform any past relevant work[.]" *Id*. at 40. At the fifth step, the ALJ concluded that, based upon Dziamalek's "age, education, work experience, and [RFC], there were jobs that existed in significant numbers in the national economy that [Dziamalek] could have performed." *Id*. at 41. Accordingly, the ALJ determined that a "finding of 'not disabled' [was] therefore appropriate[.]" *Id*. at 42.

On April 4, 2017, Dziamalek filed a request for review of the ALJ's decision by the SSA's Appeals Council, alleging that "additional medical evidence will show that some of the

findings [were] in error." Request for Review, Ex. 17B, R. at 256. The SSA Appeals Council "found no reason … to review the [ALJ's] decision" and denied Dziamalek's request for review on December 18, 2017. Notice of Appeals Council Action, R. at 1. Further, the Appeals Council stated in its decision that the supplemental medical records provided by Dziamalek were all dated after the date he was last insured and, therefore, did "not affect the decision about whether [he] was disabled beginning on or before December 31, 2015." *Id*. at 2. Dziamalek then filed a complaint before this court on February 15, 2018, urging reversal of the Commissioner's decision. Compl., Doc. No. 1. The Commissioner filed its Answer and the record on June 4, 2018. Answer, Doc. No. 21. Dziamalek filed a Motion to Reverse the Decision of the Commissioner ("Mot. to Reverse") on August 3, 2018. Mot. to Reverse, Doc. No. 23. The Commissioner filed a Motion to Affirm its Decision ("Mot to Affirm") on September 25, 2018. Mot. to Affirm, Doc. No. 24.

### III.  Discussion

On review, Dziamalek asserts that the ALJ's decision was "not supported by substantial evidence" and, therefore, he is entitled to a reversal of the Commissioner's decision. Mot. to Reverse, Doc. No. 23 at 1. Dziamalek also asserts that, in the alternative, he is entitled to a new hearing "because the errors committed by the [ALJ] prevented [Dziamalek] from receiving a full and fair hearing." *Id*. Specifically, Dziamalek contends that the ALJ: (1) made credibility findings based on misstated evidence, Mem. in Supp. Mot. to Reverse, Doc. No. 23-1 at 23; (2) failed to make proper weight assessments, *id*. at 24; and (3) erred in his description of Dziamalek's RFC, *id*. at 31. The Commissioner responds that the ALJ's decision was "supported by substantial evidence under application of the correct legal principles." Mot. to Affirm, Doc. No. 24 at 1.

A.  <u>Did the ALJ correctly evaluate the evidence in assessing Dziamalek's limitations?</u>

Dziamalek argues that the ALJ made improper credibility findings based on misstated evidence and, further, erred in his description of Dziamalek's RFC.  Mem. in Supp. Mot. to Reverse, Doc. No. 23-1 at 23.  Specifically, Dziamalek argues that the ALJ erroneously found that Dziamalek's allegations were inconsistent with, and not supported by, the evidence because the ALJ discredited Dziamalek's testimony on the basis of the following evidence: (1) Dziamalek's refusal to participate in physical therapy for his shoulder; and (2) treatment notes that show inconsistencies between Dziamalek's subjective complaints and observed limitations.  *Id.* at 23-24.  Dziamalek argues that "[t]he ALJ's findings that [his] allegations are not consistent with the evidence of record are not supported by the evidence" and, further, that "[a]ll of the ALJ's findings weighing against Mr. Dziamalek's credibility are not supported by substantial evidence."  Mem. in Supp. Mot. to Reverse, Doc. No. 23-1 at 24.  The Commissioner argues that Dziamalek's arguments "[a]t best … seek different evidentiary inferences but fail to show that any reasonable factfinder was compelled to weigh the evidence differently from the ALJ."  Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 21.

It is the ALJ's role, and not mine, "'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." *Cichocki*, 534 F. App'x at 75 (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").  Per the Social Security regulations, Dziamalek's subjective statements about his pain, taken alone, are not sufficient for an ALJ to make a disability finding.  20 C.F.R. § 416.929(a).  An ALJ must employ a two-step process for evaluating symptoms.   "First, the ALJ must determine whether the medical signs or laboratory findings show that a claimant has a

medically determinable impairment that could reasonably be expected to produce the claimant's" pain. *Cichocki*, 534 F. App'x at 75. An ALJ must consider all the claimant's "symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(a). The ALJ "will consider all of [a claimant's] statements about his symptoms, such as pain, and any description his medical sources or nonmedical sources may provide about how the symptoms affect his activities of daily living and his ability to work." *Id.* An ALJ must have "objective medical evidence from an acceptable medical source" that shows that a claimant has a medical impairment or impairments that "could reasonably be expected to produce the pain or other symptoms alleged." *Id.*

If the ALJ finds that the first step is met, then he must "'evaluate the intensity and persistence of [the claimant's] symptoms' to determine the extent to which the symptoms limit the claimant's capacity for work." *Cichocki*, 534 F. App'x at 75 (citing 20 C.F.R. § 416.929(c)(2)). In doing so, the ALJ considers "all of the available evidence" from medical and nonmedical sources, including objective medical evidence but will not reject a claimant's subjective assessment of the intensity and persistence of his pain "solely because the available objective medical evidence does not substantiate his statements." 20 C.F.R. §§ 416.929(c)(1), (2). "However, if a claimant's statements about his symptoms are not substantiated by the objective medical evidence, the ALJ must consider the other evidence and make a finding on the credibility of the individual's statements." *Cichocki*, 534 F. App'x at 76 (citing *Social Security Ruling 96-7p*, 1996 WL 374186, at *4 (July 2, 1996)). In doing so, the ALJ should consider the following factors: daily activities; "[t]he location, duration, frequency, and intensity" of the pain; "[p]recipitating and aggravating factors;" "[t]he type, dosage, effectiveness, and side effects of

any medication" taken to alleviate pain; "[t]reatment, other than medication" received for pain relief; measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain[.]"  20 C.F.R. § 416.929(c)(3).  Further, an ALJ will consider a claimant's subjective claims of pain "in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [he is] disabled" and will consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts" between the claimant's subjective claims of pain and the "rest of the evidence" including the claimant's history, laboratory findings, and medical source statements regarding pain.  20 C.F.R. § 416.929(c)(4).  If an ALJ determines that a claimant does have severe impairments, but the impairments do not meet or equal a listed impairment, then the ALJ "will consider the impact" of the claimant's impairment or impairments and related pain on the claimant's residual functional capacity.  20 C.F.R. § 416.929(d)(4).

"The ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight.'"  *Cichocki*, 534 F. App'x at 76 (citing *Social Security Ruling 96-7p*, 1996 WL 374186, at *2).  In making such a determination, the ALJ must provide more than just "a single, conclusory statement" regarding the claimant's credibility or a recitation of the relevant factors, but "remand is not required where 'the evidence of record permits [the court] to glean the rationale of an ALJ's decision[.]'"  *Id*. (citing *Mongeur*, 722 F.2d at 1040).

Here, the ALJ concluded that "the medical signs and laboratory findings sufficiently establish[ed] the presence of bilateral shoulder osteoarthritis … [and] tendinopathy of the right

shoulder" which, in combination with other medically determinable impairments, "could reasonably be expected to produce [Dziamalek's] alleged symptoms." ALJ Decision, R. at 35-36. The ALJ concluded next, though, that Dziamalek's statements concerning the intensity, persistence, and limiting effects of [the] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 36. With respect to Dziamalek's shoulders, the ALJ found that Dziamalek "refused physical therapy treatment for his shoulder impairments. . . . This failure to try all recommended treatment modalities undermine[d] [Dziamalek's] allegations of severe pain and physical limitation because it suggests his pain was less severe than he alleged. If [Dziamalek's] pain and physical limitation were as bad as he claim[ed] it [was], he would have tried anything to alleviate his pain." *Id.* at 37. The ALJ also noted that Dziamalek had success with occupational therapy for his left hand and wrist and, therefore, it was even more implausible that Dziamalek would decline therapy for his shoulder. *Id.* Further, the ALJ found that the record revealed that Dziamalek "magnified his symptoms" and highlighted Dr. Anita Karne's treatment notes from November 2013 which states that Dziamalek's "neurological examination [was] inconsistent because [Dr. Karne] observed [Dziamalek] 'walking briskly and performing fine motor tasks with excellent coordination,' prior to the examination, yet during a formal neurological examination [Dziamalek] exhibited weak grip strength and his coordination was off-balance." *Id.* (citing Ex. 3F, R. at 475). Ultimately, the ALJ opined that the evidence indicated that Dziamalek "may not be [a] reliable witness and casts doubt on his subjective allegations." *Id.*

It is the ALJ's role, not mine, to determine credibility issues. When a decision is "sufficiently specific" in making clear the reasoning for an ALJ's credibility findings, the decision must be upheld. *Cichocki*, 534 F. App'x at 75-76. Here, the ALJ determined that

Dziamalek's shoulder pain was not as limiting as he claimed because he failed to take every suggested step to improve his range of motion and decrease his pain. The ALJ noted only that Dziamalek refused physical therapy, but the record reflects that Dziamalek also refused shoulder surgery and anti-inflammatory medication. *See* Ex. 22F, R. at 1506-07. The ALJ was entitled to opine that the evidence failed to support Dziamalek's claimed limitations. Further, the ALJ was entitled to rely on the record evidence that suggested that Dziamalek had on other occasions exaggerated his physical limitations. Ex. 10F, R. at 649. Ultimately, the ALJ found inconsistencies between Dziamalek's claimed physical limitations, particularly with respect to his shoulders, and the record evidence. The ALJ was entitled to resolve those inconsistencies as he saw fit on the basis of Dziamalek's questionable credibility. Because the ALJ's determination is supported by the evidence and because the ALJ's interpretation of the evidence on this issue was rational, the ALJ did not err in his decision to assign little weight to Dziamalek's claimed limitations.

### B. Did the ALJ make improper weight assessments?

Next, Dziamalek argues that the ALJ failed to properly assess the weight of various physicians in violation of the Treating Physician Rule. Mem. in Supp. Mot. to Reverse, Doc. No. 23-1 at 24. Specifically, Dziamalek argues that the ALJ: (1) failed to make a finding with respect to the weight assigned to the opinions of treating physician Michael Wong, *id*. at 26-27; (2) erred in assigning only "little weight" to the opinions of treating physician Charles Riordan, *id*. at 27-30; and (3) erred in assigning "great weight" to the opinions of state agency psychologists, *id*. at 30-31. Further, Dziamalek argues that the ALJ failed to develop the record. Mem. in Supp. Mot. to Reverse, Doc. No. 23-1 at 29. The Commissioner asserts that "the ALJ …

reasonably considered the opinion evidence." Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 25.

"The treating physician rule provides that an ALJ should defer 'to the views of the physician who has engaged in the primary treatment of the claimant,'" but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in [the] case record."[5] *Cichocki,* 534 F. App'x at 74 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. § 404.1527(c)(2)). When the ALJ gives controlling weight to a non-treating physician, and does not give the treating source's opinion controlling weight, he must "apply the factors listed" in SSA regulations, 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418. After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a[n] … opinion," *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004), and provide "good reasons" for the weight assigned. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). But "where the ALJ's reasoning and adherence to the regulation are clear," he need not "slavish[ly] recite[] each and every factor" listed in the regulations. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order). Moreover, "[g]enuine conflicts in the medical evidence are for the Commissioner"—not the court—"to resolve." *Burgess*, 537 F.3d at 128.

---

[5] Originally a rule devised by the federal courts, the treating physician rule is now codified by SSA regulations, but "the regulations accord less deference to unsupported treating physician's opinions than d[id] [the Second Circuit's] decisions." *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," and has advised that, ordinarily, "a consulting physician's opinions or reports should be given little weight." *Selian*, 708 F.3d at 419; *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). In some circumstances, however, "the report of a consultative physician may constitute [substantial] evidence." *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *see also Prince v. Astrue*, 490 F. App'x 399, 401 (2d Cir. 2013) ("consultative examinations were still rightly weighed as medical evidence"); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("the report of a consultative physician may constitute … substantial evidence"). An ALJ is entitled to rely on the opinions of state agency medical consultants in issuing decisions. *See Social Security Ruling 96-6p*, 1996 WL 374180 (1996).

### 1. *Dr. Michael Wong*

Dziamalek argues first that the ALJ failed to make a finding with respect to the weight assigned to the opinions of treating physician Dr. Wong. Mem. in Supp. Mot. to Reverse, Doc. No. 23-1 at 26-27. The Commissioner argues that Dziamalek's argument is misleading because Dr. Wong's medical source statement was submitted after the ALJ's decision, and Dziamalek did not begin treating with Dr. Wong until March 2016, which is after the alleged period of disability. Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 24-26.

Dziamalek began treating at Back to Health of Branford on March 6, 2015 and he saw APRN Kristi Maynard. Ex. 22F, R. at 1512. He returned on March 16, 2015 and saw APRN Maynard again for a physical exam. *Id*. at 1510. He saw APRN Lauren Calgreen on June 25 and July 20, 2015 with complaints of arm and shoulder pain. *Id*. at 1506, 1508. Dziamalek again saw APRN Calgreen and APRN Maynard on January 20, 2016 and February 29, 2016,

respectively. *Id*. at 1503, 1505. On March 3, 2016, Dziamalek returned to Back to Health to review x-rays and he saw Dr. Wong for the first time. *Id*. at 1501. He returned on March 16, 2016 for leg pain and May 11, 2016 for a follow up from the ER and saw APRN Maynard both times. *Id*. at 1497, 1499. He returned on July 21, 2016 for a follow up on his back, right hip, and right leg, on August 6, 2016 for a follow up after a hospitalization, on August 20, 2016 for a follow up, on August 23, 2016 for stomach issues, and August 30, 2016 for a follow up. *Id*. at 1486-96. He saw Dr. Wong each of those five times. *Id*.

On April 29, 2017, Dr. Wong filled out a Medical Source Statement regarding Dziamalek's physical limitations. *See* R. at 15. In it, Dr. Wong opined that Dziamalek could occasionally lift and/or carry less than ten pounds; could stand or walk less than two hours in an eight-hour workday; could sit less than six hours in an eight-hour workday; must periodically alternate between sitting and standing throughout the day; could never climb, balance, kneel, crouch, crawl, or stoop; could only occasionally reach, handle, finger, and feel in either his right or left hand; and had limitations in temperature extremes, noise, dust, vibration, humidity/wetness, hazards, fumes, odors, chemicals, and gasses. *Id*. at 15-17. Although directed to explain many of his answers, Dr. Wong failed to do so. *See id.*

Dziamalek argues first that "[t]he ALJ did not make findings as to [Dr. Wong's] medical source statement." Mem. in Supp. Mot. to Reverse, Doc. No. 23-1 at 26. The ALJ issued his opinion on February 2, 2017, however, almost three months *before* Dr. Wong filled out the Medical Source Statement. *See* ALJ Decision, R. at 42; Medical Source Statement, R. at 17. Accordingly, the ALJ certainly cannot be faulted for failing to comment on a statement that had yet to be made.

Dziamalek submitted Dr. Wong's assessment to the Appeals Council, which "found no reason … to review the [ALJ's] decision" and also stated that the supplemental medical records were all after Dziamalek's last insured date and, therefore, were not relevant to the timeframe at issue. Notice of Appeals Council Action, R. at 1-2. To the extent that Dziamalek claims that the Appeals Council failed to adequately consider Dr. Wong's Medical Source Statement when it denied review of the ALJ's decision, that too must fail. The Appeals Council will review a case if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5). Further, "[t]he Appeals Council will only consider additional evidence under paragraph (a)(5) … if [a claimant] show[s] good cause for not informing [the Council] about or submitting the evidence[.]" 20 C.F.R. § 404.970(b). Examples of "good cause" include: "a physical, mental, education, or linguistic limitation(s) that prevented [the claimant] from informing [the Council] about or submitting the evidence earlier;" or "some other unusual, unexpected, or unavoidable circumstance beyond [the claimant's] control" that kept him from submitting the evidence earlier, such as serious illness, death of a family member, or the accidental destruction of records. 20 C.F.R. § 404.970(b)(2), (3).

Dziamalek cannot argue that the Appeals Council improperly denied review of his case on the basis of Dr. Wong's Medical Source Statement, to the extent he makes that argument. The record does not reveal that Dziamalek had any "good cause" for failing to submit Dr. Wong's statement earlier. Dziamalek began treating with Dr. Wong on March 3, 2016, four months before his hearing, and almost a year before the ALJ issued his decision. Dziamalek could have sought and submitted a Medical Source Statement from Dr. Wong at any point after

he began treating. Indeed, the ALJ left the record open for three weeks after the July 11, 2016 hearing for Dziamalek to submit any supplemental records.

Further, there is not a "reasonable probability" that Dr. Wong's Medical Source Statement "would change the outcome of the decision." *See* 20 C.F.R. § 404.970(a)(5). First, Dr. Wong did not start treating Dziamalek until after the date last insured and, therefore, his medical source statement was irrelevant because Dr. Wong was not a treating physician during the timeframe in question. In any event, however, Dr. Wong's statement was wholly conclusory, failed to explain any of his answers, and was completely form.

Accordingly, the ALJ did not err in failing to consider Dr. Wong's Medical Source Statement, nor did the Appeals Council err when it declined to review the ALJ's decision on the basis of the newly submitted evidence.

## 2. *Dr. Charles Riordan; State Agency Psychologists*

Dziamalek argues next that the ALJ erred because he assigned only "little weight" to the opinion of treating physician Dr. Charles Riordan, but assigned "great weight" to the opinions of state agency psychologists. Mem. in Supp. Mot. to Reverse, Doc. No. 23-1 at 27-31. Dziamalek argues that the case "should be remanded so that the ALJ can assign controlling, or at least significant weight[,] to the opinion of long-time treating physician Dr. Riordan." *Id*. at 30.

On March 6, 2014, Clinician Christine Godfrey filled out a Mental Impairment Questionnaire for Dziamalek's disability application, co-signed by Dr. Charles Riordan. Ex. 9F, R. at 537. In it, Ms. Godfrey and Dr. Riordan reported that they saw Dziamalek three times per week from November 5, 2012 and, at the time of the questionnaire, he was still in their care. *Id*. at 538. They reported that throughout their care of Dziamalek, he had shown "slight improvement" but that he had "difficulty [with] memory and concentration" and "currently

presents [with] poor judgment [and] insight" because of his suicide attempts and suicidal thoughts, as well as his "inconsistent sobriety." Ex. 9F, R. at 538-39. Further, the providers reported that the following functional abilities were slight problems on a weekly basis: taking care of personal hygiene; and caring for physical needs such as dressing and eating. *Id*. at 539. The providers reported that the following abilities were serious daily problems: using good judgment regarding safety and dangerous circumstances; using appropriate coping skills to meet ordinary demands of a work environment; and handling frustration appropriately. *Id*.

With respect to social interactions, the providers reported that interacting appropriately with others in a work environment was a serious daily problem for Dziamalek, and the following were obvious daily problems for him: asking questions or requesting assistance; respecting/responding appropriately to others in authority; and getting along with others without distracting them or exhibiting behavioral extremes. *Id*. at 540. Further, with respect to task performance, the providers determined that Dziamalek had no problem with carrying out single-step instructions, but multi-step instructions were an obvious daily problem for him, and changing from one simple task to another was a slight daily problem. *Id*. The providers also reported that Dziamalek had an obvious daily problem with focusing long enough to finish assigned simple activities or tasks and performing basic work activities at a reasonable pace/finishing on time. *Id*. Notably, the providers reported that Dziamalek had a serious daily problem with performing work activity on a sustained basis (i.e., eight hours per day for five days a week). *Id*.

On March 10, 2014, at the initial review stage, state agency reviewer Dr. Christopher Leveille, PsyD, filled out a Mental RFC analysis. *See* Ex. 2A, R. at 135-37. In it, he determined that Dziamalek had no understanding or memory limitations. *Id*. at 136. Dr. Leveille opined that

Dziamalek had sustained concentration and persistence limitations but was "not significantly limited" in the following areas: the ability to carry out very short and simple instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or in proximity to others without being distracted by them; the ability to make simple work-related decisions; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number length of rest periods. *Id*. Dr. Leveille found that Dziamalek was "moderately limited" in one area of sustained concentration and persistence limitations: the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. *Id*. Dr. Leveille opined that Dziamalek was "able to remember and carry out routine work tasks with adequate [attention, concentration], pace, and persistence for a normal week" but that Dziamalek's substance abuse may disrupt work attendance. *Id*.

Dr. Leveille further opined that Dziamalek had social interaction limitations and was "moderately limited" in the following areas: the ability to interact appropriately with the general public; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id*. Dr. Leveille further opined that Dziamalek was "not significantly limited" in the following areas of social interaction: the ability to ask simple questions or request assistance; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. *Id*. Dr. Leveille opined that Dziamalek's substance abuse "may tend to compromise extensive interactions with the general public" and

that he would be "best suited for tasks requiring little collaboration or teamwork" and would "be able to relate adequately with coworkers and supervisors for task purposes." *Id*. at 137. Dr. Leveille also found that Dziamalek did not have any adaptation limitations. *Id*.

On May 28, 2014, at the reconsideration level, state agency reviewer Dr. Jerrold Goodman, PhD, also filled out a Mental RFC analysis in which he made the exact same findings as Dr. Leveille. *See* Ex. 4A, R. at 151-52.

In his decision, the ALJ granted "little weight" to Godfrey and Dr. Riordan's questionnaire because, even though they treated Dziamalek, there was "[s]ubstantial medical evidence in the record" that contradicted their opinion. ALJ Decision, R. at 39. Further, the ALJ determined that their opinion was "not 'not inconsistent' with the medical evidence in the record" because the evidence showed that Dziamalek's "medication was effective and at his baseline level of improvement, his symptoms were not debilitating." *Id*. The ALJ found that the "evidence [did] not support Ms. Godfrey and Dr. Riordan's opinion that [Dziamalek] ha[d] obvious to serious limitation in almost every area of mental functioning." *Id*.

Further, the ALJ stated that he "considered and weighed the opinions of the State agency medical doctors and/or psychologists." ALJ Decision, R. at 39. In doing so, he gave "great weight to the mental residual functional capacity ('MRFC') assessments of the DDS psychologists," Dr. Leveille (Ex. 2A) and Dr. Goodman (Ex. 4A). *Id*. at 40. The ALJ further opined that although Dziamalek "submitted additional evidence at the hearing level, that additional evidence [was] not inconsistent with the assessments of the State agency doctors." *Id*. The ALJ went on to find, however, that "a conclusion that [Dziamalek's impairments [were] more severe than was concluded by the state examining and non-examining doctors" was justified because of the "additional medical evidence received in the course of the developing

[Dziamalek's] case for review at the administrative hearing level," "a different interpretation of the earlier records," and "evidence in the form of testimony at [Dziamalek's] hearing." *Id.*

Because the ALJ assigned controlling weight to non-treating physicians, as opposed to Dr. Riordan, the ALJ must consider the SSA factors including the nature of treatment and the support for the opinion, and then must provide "good reasons" for the weight assigned. *Burgess*, 537 F.3d at 129. Here, the ALJ provided reasoning for why he gave Dr. Riordan's opinion less weight than those of Dr. Leveille and Dr. Goodman. Although there is no question that Dziamalek suffered from mental impairments, including multiple suicide attempts, the medical record supports the ALJ's conclusion that Dziamalek's mental impairments were less severe than listed by Dr. Riordan. For instance, the record reveals that Dziamalek's mental state was made worse by drugs and alcohol, but he was successfully attempting to stay sober, and his mood was well-controlled with medical intervention. *See* Ex. 1F, R. at 420 (alcohol and cocaine made Dziamalek "aggressive, agitated, and want[ing] to fight"); Ex. 1F, R. at 414 (drugs and alcohol made Dziamalek suicidal); Ex. 10F, R. at 613, 617 (emergency room visit for "confusion" due to too much Valium but was "completely conversant, interactive, and alert" when drugs out of his system); Ex. 1F, R. at 361 (suicide attempt due to a change in his medication); Ex. 11F, R. at 722 (Dziamalek reported feeling "significantly better" after psychiatric hospitalization); Ex. 3F, R. at 481 (Dziamalek making progress in his sobriety).

Further, the medical record reflects that Dziamalek was routinely noted as having unremarkable affect, mood, thought process, and orientation. *See* Ex. 4F, R. at 504 (treatment notes from BH Care in 2013); Ex. 8F, R. at 521-36 (progress notes from BH Care in 2014); Ex. 16F, R. at 814-28 (progress notes from BH Care in 2015). Moreover, throughout his treatment with BH Care, Dziamalek consistently and successfully participated in group therapy, suggesting

that he was more cooperative and could work with others more successfully than Dr. Riordan suggested. *See id.* The record also supports the ALJ's conclusion that Dziamalek's ability to concentrate and work effectively was not as limited as Dr. Riordan suggested. *See* Ex. 10F, R. at 679 (notes reflect that in occupational therapy for his hand and wrist, Dziamalek "[w]orked well on focused tasks for [one hour]"); Ex. 10F, R. at 679-96 (treatment notes from occupational therapy reflect that Dziamalek's effort increased from "fair" to "excellent" over time); Ex. 11F, R. at 718-21 (improvement from "serious" to "moderate" impairments in social or occupational functioning).

The ALJ made clear the reasons why he chose to give the state agency reviewing doctors' evaluations, which are supported by the record, more weight than that of Dr. Riordan. Although he did not "slavish[ly] recite" each factor, he was not required to do so. *Atwater*, 512 F. App'x at 70. The opinions of Dr. Riordan and the state agency medical reviewers genuinely conflicted and the resolution of such conflicts are not for the court to resolve. *Burgess*, 537 F.3d at 128. Accordingly, the ALJ did not err when it accorded greater weight to the state agency reviewers and Dziamalek is not entitled to a remand on this basis.[6]

### 3. *Developing the Record*

Dziamalek argues that "the ALJ had an opportunity to further develop the opinion evidence of record, but he chose not to do so" when he dismissed Dr. Efobi without testimony and failed to hold a subsequent hearing when "new and material evidence was added to the record after the hearing." Mem. in Supp. Mot. to Reverse, Doc. No. 23-1 at 29. The Commissioner argues that the record contained sufficient evidence to reach a decision, and the

---

[6] Dziamalek also argues that the ALJ failed to consider Dr. Riordan's more recent assessment, completed on May 1, 2017. *See* Medical Source Statement, R. at 19. This argument suffers the same flaws as Dziamalek's argument regarding Dr. Wong's April 29, 2017 assessment. *See* Section III(B)(1) of this opinion.

decision whether "to seek additional evidence is a matter within an ALJ's discretion", and Dziamalek failed to overcome that discretion. Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 29.

In general, "the ALJ, unlike a judge in a trial, must … affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even if the claimant is represented by counsel." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (citation omitted) (internal quotation marks omitted). "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information." *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)). The failure of the ALJ to procure formal opinions about a claimant's residual functional capacity does not, by itself, require remand where the medical record is "quite extensive[,] … voluminous[,] … [and] adequate to permit an informed finding by the ALJ." *Tankisi*, 521 F. App'x at 34. "Remand is not always required when an ALJ fails in his duty to request opinions particularly where … the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Id.* That is particularly true where the record includes assessments of the claimant's limitations from a treating physician. *Id.* Remand is required where an ALJ's residual functional capacity decision is "wholly unsupported by any medical evidence." *Jermyn v. Colvin*, 2015 WL 1298997, at *19 (E.D.N.Y Mar. 23, 2015). Additionally, a claimant "must show that [she] was harmed by the alleged inadequacy of the record." *Santiago v. Astrue*, 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011).

Here, the ALJ released Dr. Efobi from the hearing because he would not have added any helpful and/or relevant testimony. *See* Tr. of ALJ Hr'g, R. at 87. Further, after the hearing,

Dziamalek provided additional records, which the ALJ commented on in his decision, stating that they were not "particularly illuminating because they show the same signs and symptoms in the earlier records." ALJ Decision, R. at 38. Further, the ALJ stated that the additional evidence submitted was "not inconsistent with the assessments of the State agency doctors" and, therefore, it did not undermine his decision. It is clear that the ALJ took the additional information into consideration and it was well within his discretion to determine whether an additional hearing was necessary in order to evaluate and/or understand the records. As analyzed throughout this opinion, the ALJ's decision was supported by substantial evidence and the extensive and voluminous record was "adequate to permit an informed finding by the ALJ." *Tankisi*, 521 F. App'x at 34. Accordingly, there were no obvious gaps in the record, and therefore, the ALJ was under no obligation to seek additional information or testimony. The ALJ's decision not to have additional testimony does not require remand under the circumstances.

C. Did the ALJ err in his description of Dziamalek's RFC?

Lastly, Dziamalek argues that the ALJ erred in formulating Dziamalek's RFC. Mem. in Supp. Mot. to Reverse, Doc. No. 23-1 at 31. Specifically, Dziamalek argues that the ALJ erred with respect to the following areas of the RFC finding: (1) collaboration or teamwork, *id*. at 32-33; (2) exposure to fumes, odors, dusts, gases, or poor ventilation, *id*. at 33-34; (3) left-handed handling, fingering, and feeling, *id*. at 34-35; and (4) off-task behavior, *id*. at 35-36. The Commissioner argues that "the ALJ's evidentiary analysis was at a minimum reasonable, and thus[,] under the substantial evidence standard of review[,] the ALJ's decision should be affirmed." Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 36.

Between steps three and four of the SSA's analysis for disability claims, the ALJ must "determine[], based on all the relevant medical and other evidence of record, the claimant's

'residual functional capacity,' which is what the claimant can still do despite the limitations imposed by [her] impairment."  *Greek*, 802 F.3d at 373 n.2 (citing C.F.R. § 404.1520(b)).  The ALJ's determination need not "perfectly correspond with" any medical source opinion.  *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order).  Rather, the ALJ is "entitled to weigh all of the evidence available to make a[] … finding that [is] consistent with the record as a whole."  *Id.*  In assessing a claimant's residual functional capacity, SSA regulations require the ALJ to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)," as well as "discuss[ing] the [claimant]'s ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis … and describ[ing] the maximum amount of each work-related activity the [claimant] can perform based on the evidence available in the case record."  Social Security Ruling 96-8p, 1996 WL 374184, at *7.  Finally, the ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  *Id.*

### 1. *Collaboration or Teamwork*

The ALJ determined in Dziamalek's RFC that he could perform light work with multiple limitations, including "only occasional collaboration or teamwork with others."  ALJ Decision, R. at 34.  As support, the ALJ found that Dziamalek was diagnosed with depressive disorder and anxiety and that "[c]linical signs consistent with depression and anxiety included depressed mood, anxious mood, and suicidal ideation."  *Id*. at 35 (referencing Ex. 5F, R. at 514; Ex. 1F, R. at 329; Ex. 9F, R. at 539).  The ALJ found that "the State agency psychologist consultants carefully examined the medical evidence submitted at the initial and reconsideration levels and determined [Dziamalek's] anxiety and depression were severe, but not disabling."  *Id*. at 38.

Further, the ALJ highlighted medical records that reflected that Dziamalek was "cooperative" and "calm" and his mood and limitations were well-controlled with medication. *Id.* The ALJ then analyzed the mental RFC assessments from Dr. Riordan and the state agency reviewers, as discussed above. Dziamalek argues that "occasional collaboration or teamwork with others … is more coworker contact than [he] is able to perform" and argues that "the ALJ should have limited [him] to no coworker contact, and to no teamwork or collaborative tasks" based on Dziamalek's history of fighting. Mem. in Supp. Mot. to Reverse, Doc. No. 23-1 at 32.

As aforementioned, the ALJ was entitled to rely on the opinions of the state agency reviewers who opined that Dziamalek was only "moderately limited" in his ability to interact with the general public and get along with coworkers but "not significantly limited" in all other areas of social interaction (Ex. 2A, R. at 136), rather than Dr. Riordan's opinion that Dziamalek had a "serious daily problem" with interacting with others in a work environment (Ex. 9F, R. at 540). Dr. Leveille's and Dr. Goodman's opinions support the ALJ's determination that Dziamalek's RFC was limited to "only occasional collaboration or teamwork with others." Further, as discussed above, the medical record reflects that Dziamalek was not as limited in social interaction as Dr. Riordan suggested and, therefore, a more limited RFC was not warranted. *See* Section III(B)(2). The ALJ weighed the record evidence and made a finding that was "consistent with the record as a whole" with respect to Dziamalek's interaction limitations and, therefore, Dziamalek is not entitled to a remand.

### 2. *Off-Task Behavior*

The ALJ did not find an RFC limitation for off-task behavior. *See* ALJ Decision, R. at 34. Dziamalek argues that the ALJ "should have included at least occasional off-task behavior up to 30% of the work day." Mem. in Supp. Mot. to Reverse, Doc. 23-1 at 35.

Again, the ALJ was entitled to rely on the opinions of the state agency reviewers who opined that Dziamalek was only "moderately limited" in his ability to perform activities within a schedule and "not significantly limited" in all other areas of sustained concentration and persistence limitations (Ex. 2A, R. at 136), rather than Dr. Riordan's opinion that Dziamalek had an "obvious" problem with focusing long enough to finish assigned simple activities or tasks and performing basic work activities at a reasonable pace (Ex. 9F, R. at 540). Dr. Leveille's and Dr. Goodman's opinions support the ALJ's determination that Dziamalek's RFC was not limited by any off-task behavior. Further, as discussed above, the medical record reflects that Dziamalek was not as limited in task completion as Dr. Riordan suggested and, therefore, a more limited RFC was not warranted. *See* Section III(B)(2).

The ALJ weighed the record evidence and made a finding that was "consistent with the record as a whole" with respect to Dziamalek's task completion and, therefore, Dziamalek is not entitled to a remand.

### 3. *Exposure to Pulmonary Irritants*

The ALJ determined that Dziamalek's RFC was limited to avoiding concentrated exposure to fumes, odors, dust, gases, or poor ventilation. ALJ Decision, R. at 34. As support, the ALJ found that Dziamalek was diagnosed with COPD and pulmonary functioning testing revealed "moderate DLCO (diffuse capacity of the lung for carbon monoxide) reduction with no bronchodilator response." *Id*. at 35. Dziamalek argues that "the ALJ should have limited him to significantly less than concentrated exposure" because his COPD "limit[ed] his ability to be expose[d] to *any* pulmonary irritants, and not just concentrated pulmonary irritants." Mem. in Supp. Mot. to Reverse, Doc. No. 23-1 at 33 (emphasis added).

Although there is no question that Dziamalek suffered from COPD and, therefore, lung function limitations, the medical record does not support Dziamalek's claim that he is entitled to a more restrictive RFC with respect to pulmonary irritants than was found by the ALJ. The record as whole reflects that even with COPD, Dziamalek had good lung function near the beginning of the relevant timeframe. *See* Ex. 2F, R. at 453 (Dziamalek had very good exercise capacity); Ex. 3F, R. at 485 (normal total lung capacity). Although the medical record reflects that Dziamalek's lung function declined somewhat, there was nothing to suggest that it was not well-controlled and/or severely limiting. *See* 3F, R. at 491-92 (physical examination revealed reduced air entry bilaterally); Ex. 1F, R. at 396 (airflow limitation worsening). Further, although Dziamalek was diagnosed with lung nodules, the medical record reflects that they were "tiny," "benign," "stable," and "unchanged" over time. *See* Ex. 13F, R. at 760 (September 2011); Ex. 17F, R. at 849 (October 2013 and May 2014); Ex. 19F, R. at 1066 (September 2014); Ex. 17F, R. at 843 (November 2015). Moreover, there was nothing in the record to suggest that the lung nodules precluded Dziamalek from being exposed to pulmonary irritants.

The ALJ considered Dziamalek's diagnosis of COPD when determining his RFC and found that Dziamalek must avoid concentrated exposure to pulmonary irritants. There was nothing in the record, nor does Dziamalek point to anything, to suggest that Dziamalek's RFC should be more limited. The limitation was consistent with the record and, therefore a more restrictive RFC was not warranted.

### 4. *Left-Handed Handling, Fingering, Feeling*

The ALJ determined that Dziamalek's RFC was limited to "only frequent handling, fingering, or feeling with the non-dominant left upper extremity." ALJ Decision, R. at 34. As support, the ALJ found that Dziamalek had "residual effects of left wrist tendon and nerve

repair" which, after surgery, led to "no sensation in the small finger, decreased sensation in the ulnar [fourth] digit, and weak intrinsic hand muscles." *Id*. at 35 (referencing Ex. 6F, R. at 519). But, the ALJ referenced medical records that reflected "no deficits" in Dziamalek's upper extremities in determining that the evidence did "not support [Dziamalek's] allegations that he [could] lift only a loaf of bread and [had] to use two hands to carry a gallon of milk." *Id*. at 37 (referencing Ex. 10F, R. at 614). Further, the ALJ found that Dziamalek's hand improved with occupational therapy and, within six weeks of surgery, Dziamalek "made gains in all area and had mild difficulties." *Id*. (referencing Ex. 10F, R. at 686). The ALJ also highlighted "[o]bjective testing [which] showed evidence of significant improvement," including his grip strength which increased by 25 pounds between December 30, 2013 to January 21, 2014. *Id*. (referencing Ex. 10F at 684, 691). As discussed above, the ALJ also discredited Dziamalek's subjective complaints of pain and limitations. *Id*. Dziamalek argues that the ALJ "should have limited [him] to only occasional handling, fingering, and feeling with his left hand." Mem. in Supp. Mot. to Reverse, Doc. No. 23-1 at 34.

Dziamalek underwent hand and wrist surgery in November 2013 after a suicide attempt. Ex. 1F, R. at 342. Although the record reflects that this was a substantial injury which required extensive rehabilitation, the record also reflects that Dziamalek made significant gains in his hand usage. *See* Ex. 6F, R. at 517, 519 (although little to no sensation in little and ring finger, could make a fist easily and was healing well); Ex. 10F, R. at 679-96 (treatment notes from occupational therapy reflect that Dziamalek's effort increased from "fair" to "excellent" over time); Ex. 10F, R. at 679 (could manipulate common objects and could use hand for one hour at a time); Ex. 10F, R. at 683 (had active range of motion); Ex. 10F, R. at 686 (significant gains in all areas); Ex. 10F, R. at 694 (had significant improvement); Ex. 10F, R. at 697 (left hand

strength significantly improved); Ex. 10F, R. at 701-02 (hand was significantly improved and showed significant gains in all areas).

The ALJ considered Dziamalek's continuing hand limitations when determining his RFC and found that Dziamalek could frequently use his left hand. The limitation was consistent with the record and, therefore a more restrictive RFC was not warranted. Here, Dziamalek's "disagreement is with the ALJ's weighing of the evidence," which is best left to the ALJ's discretion. *See Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016). Accordingly, the ALJ did not err in the limitations assigned to Dziamalek's use of his left hand.

## IV.    Conclusion

For the reasons set forth above, Dziamalek's Motion to Reverse (Doc. No. 23) is **DENIED**, and the Commissioner's Motion to Affirm (Doc. No. 24) is **GRANTED**. The Clerk shall enter judgment and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 3rd day of September 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge